**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| THEODORE WASHINGTON, *Petitioner-Appellant*, <br><br> v. <br><br> DAVID SHINN, Director, *Respondent-Appellee.* | No. 05-99009 <br><br> D.C. No. CV-95-02460-JAT <br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted September 8, 2021
San Francisco, California

Filed December 20, 2021
Amended August 29, 2022

Before: Ronald M. Gould, Consuelo M. Callahan, and
Lawrence VanDyke, Circuit Judges.

Order;
Opinion by Judge Callahan;
Concurrence by Judge Gould

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel (1) filed an amended opinion along with Judge Gould's separate concurrence, (2) denied a petition for panel rehearing, and (3) denied on behalf of the court a petition for rehearing en banc, in a case in which the panel affirmed the district court's denial of Theodore Washington's habeas corpus petition challenging his Arizona conviction and death sentence for first-degree murder.

Washington asserted that he is entitled to relief on several grounds, the majority of which the panel addressed in a memorandum disposition filed on January 15, 2021. In this opinion, as amended, the panel addressed Washington's certified claim for ineffective assistance of trial counsel—that counsel did not investigate and present mitigating evidence at the penalty phase, including evidence of diffuse brain damage, childhood abuse, and substance abuse.

Because Washington filed his habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the panel reviewed the claim under the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, without the added deference required under AEDPA.

The panel recognized that certain forms of investigation such as readily available school, employment, and medical records are fundamental to preparing for virtually every

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

capital sentencing proceeding, but wrote that there is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. This presumption of reasonableness means that not only does the court give the attorneys the benefit of the doubt, but the court must also affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did. Accordingly, in reviewing specific claims of ineffective assistance of counsel based on counsel's alleged failure to investigate, the court must consider what information was readily available to trial counsel at the time and whether there is any evidence that undermines counsel's decisions at that time not to conduct further investigations.

The panel held that Washington did not meet his burden under the first *Strickland* prong of showing constitutionally deficient performance by failing to obtain and review Washington's education and incarceration records, where counsel did not ignore Washington's education and correction records, but believed that his interviews with Washington, Washington's common law wife, and others were sufficient; where counsel presented testimonial evidence of Washington struggling in school and dropping out in the tenth or eleventh grade; and where there was no showing that those records contained meaningful mitigation evidence.

The panel held that Washington did not meet his burden of showing that trial counsel erred by not further investigating Washington's childhood abuse, to the extent that he could have, or by not presenting the information he did not have regarding abuse at sentencing hearing.

The panel held that Washington's allegation that trial counsel erred by not investigating and presenting evidence

of his substance abuse fails because counsel was not timely informed of Washington's substance abuse.

The panel held that Washington also did not show that trial counsel erred by not seeking a psychological evaluation, where (1) counsel testified that nothing in his extensive interviews with Washington's family and friends triggered any red flags signaling that further investigation of Washington's mental condition would have been fruitful; (2) counsel for the most part knew neither of later assertions of diffuse brain damage, a dysfunctional family background, and alcohol and cocaine addiction, nor of evidence supporting the assertions; and (3) the record of post-conviction review (PCR) proceedings does not contain any medical records substantiating Washington's claims of head injuries.

The panel concluded that under the deferential standard required by *Strickland* and its progeny, counsel's investigation was more than adequate, and his performance was reasonable.

The panel held that even if trial counsel's performance had been deficient, Washington would not be entitled to relief because he cannot show prejudice, where the sentencing judge said that Washington's new evidence in the PCR hearing would not have made a difference, and a fair evaluation of the evidence in light of Supreme Court precedent confirms the soundness of the sentencing judge's finding of no prejudice.

The panel wrote that it is not insensitive to the fact that Washington is the only one of the three perpetrators who continues to face the death penalty. The panel emphasized, however, that the critical questions—whether counsel's

performance was constitutionally deficient and whether any deficiency resulted in prejudice—must be individually considered and separately considered in each case.

The panel rejected Washington's argument that trial counsel was ineffective because he allowed the state court to require a nexus between his proffered mitigating evidence and the crime. The panel wrote that the sentencing judge did consider the evidence of substance abuse, and that the judge's conclusion that the evidence of substance abuse lacked a causal nexus to the crime was appropriate because a court is free to assign less weight to mitigating factors that did not influence a defendant's conduct at the time of the crime.

Judge Gould concurred in part and concurred in the judgment. He joined the opening paragraph (except for the language on page 7 stating that "Washington has not shown either that his trial counsel's performance was constitutionally deficient or"), Sections I, II, III, V, VI, and VII, but did not join Sections IV and VIII, which he concluded are unnecessary to resolve the *Strickland* ineffective assistance of counsel issue.

**COUNSEL**

Nathaniel C. Love (argued), Grace L.W. St. Vicent, Andrew F. Rodheim, and Julia G. Tabat, Sidley Austin LLP, Chicago, Illinois; Jean-Claude André, Sidley Austin LLP, Los Angeles, California; Gilbert H. Levy, The Law Offices of Gilbert H. Levy, Seattle, Washington; Mark E. Haddad, University of Southern California Gould School of Law, Los Angeles, California; for Petitioner-Appellant.

Laura P. Chiasson (argued), Assistant Attorney General; Lacey Stover Gard, Acting Chief Counsel, Capital Litigation Section; Mark Brnovich, Attorney General; Office of the Attorney General, Tucson, Arizona; for Respondent-Appellee.

## ORDER

The opinion filed on December 20, 2021, is amended by the opinion along with Judge Gould's separate concurrence filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for panel rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are otherwise **DENIED**, and no further petitions will be accepted.

## OPINION

CALLAHAN, Circuit Judge:

Arizona state prisoner Theodore Washington appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. In 1987, a jury convicted Washington for the murder of Sterleen Hill and the attempted murder of Ralph Hill, and the trial court judge sentenced him to death.

In his habeas corpus petition, Washington challenges his conviction and sentence on the first-degree murder charge. He asserts that he is entitled to habeas relief on several grounds, the majority of which we addressed in our memorandum disposition filed on January 15, 2021, *Washington v. Ryan*, 840 F. App'x 143 (9th Cir. 2021). In this opinion we again address Washington's certified claim for ineffective assistance of trial counsel.[1] Washington contends that his counsel did not investigate and present mitigating evidence at the penalty phase, including evidence of diffuse brain damage, childhood abuse, and substance abuse. Applying the standard for evaluating ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984),[2] we conclude that Washington has not shown either that his trial counsel's performance was constitutionally deficient or that the deficiencies were prejudicial. Accordingly, we affirm the district court's denial of his habeas petition.

# I

At around 11:45 p.m. on the night of June 8, 1987, at least two men forced their way into Ralph and Sterleen Hill's home in Yuma, Arizona. The men forced the Hills to lie face down on the floor of the master bedroom with their hands bound in preparation to be shot execution-style. One of the men intermittently "screwed" a pistol in Ralph's ear while

---

[1] Our previous opinion, *Washington v. Ryan*, 922 F.3d 419 (9th Cir. 2019), was withdrawn on January 15, 2021. *Washington v. Ryan*, 840 F. App'x 143 (9th Cir. 2021). In that order we requested that the parties file supplemental briefs addressing the significance of *Shinn v. Kayer*, 141 S. Ct. 517 (2020). Following the submission of supplemental briefs, we heard re-argument on September 8, 2021.

[2] This opinion omits parallel citations.

both men yelled at the couple demanding that the Hills give them drugs or money. Ralph glimpsed one of the assailants as he ransacked the drawers and closets in the room. Sterleen was forced to listen helplessly as her husband was shot first and then wait as the shotgun was reloaded, knowing that she would be next. Had the Hills' teenage son, LeSean, not run off, it is evident that he would have suffered the same fate. (Ralph testified he heard a voice in the background say, "We better get the kid."). The Hills were discovered lying face down in their bedroom. Ralph survived the horrendous shot to his head, but was seriously injured. Sterleen did not survive the shooting.

Police arrested Fred Robinson shortly after the incident. Robinson was the common law husband of Susan Hill, Ralph Hill's daughter from a prior marriage. Police also arrested Jimmy Mathers and Theodore Washington in connection with the crimes. Arizona charged the three men with first-degree murder for the death of Sterleen Hill, attempted first degree murder, aggravated assault causing serious physical injury, aggravated assault using a deadly weapon, burglary in the first degree, and armed robbery. The three men were tried together, and the jury convicted on all counts.

## A.

The penalty phase of the trial commenced on January 8, 1988. Washington's trial counsel, Robert Clarke, called three witnesses to testify on Washington's behalf: Washington's friend, Steve Thomas; Washington's mother, Willa Mae Skinner; and Washington's half-brother, John Mondy.

Steve Thomas testified that he knew Washington for two years. He testified that Washington was easily influenced but not violent. He also testified that Washington was a

dedicated father. When asked if Washington had a drug problem, Thomas testified that he had not noticed one. Skinner testified that Washington was a good child and that he dropped out of school when he was in high school. She also testified that Washington was a good father, and that he was gentle and "liked to party." Finally, Mondy reiterated that Washington was affable but easily led. He also confirmed that Washington had trouble in school as a child.

During closing argument, Clarke focused primarily on attacking the sufficiency of the court's findings under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). Regarding mitigation, Clarke urged the court to consider Washington's age, his relatively minor criminal record, his good relationship with his son, and his general demeanor as a caring individual.

The trial court found that the state had established two aggravating factors beyond a reasonable doubt: (1) that the murder was committed in an especially cruel, heinous, or depraved manner, and (2) that the murder was committed for, or motivated by, pecuniary gain. With respect to mitigation, the court found that Washington's age was not a mitigating factor and that the remaining mitigating factors did not outweigh the aggravating factors. The court sentenced all three defendants to death on the first-degree murder charges.

## B.

Washington, Robinson, and Mathers each appealed his conviction and sentence to the Arizona Supreme Court. The state high court affirmed Washington and Robinson's convictions and sentences, *State v. Robinson*, 796 P.2d 853 (Ariz. 1990), but found insufficient evidence to convict

James Mathers and vacated his conviction, *State v. Mathers*, 796 P.2d 866 (Ariz. 1990).

Following the direct appeal process, Washington and Robinson challenged their convictions and sentences on post-conviction review ("PCR"). The trial court held a joint PCR hearing on September 8, 1993. The Honorable Stewart Bradshaw, the same judge who presided over the trial, presided over the post-conviction review proceeding. Washington, through his appellate counsel, argued that Clarke was ineffective at the penalty phase due to his failure to present mitigating evidence. Specifically, Washington argued that Clarke erred by failing to conduct a more thorough review of his school, medical, and incarceration records. Washington also argued that Clarke should have obtained a psychological evaluation and presented the results to the court.

The bulk of the new evidence presented at the PCR hearing was elicited through the testimony of Dr. Tod Roy, the defense counsel's retained psychologist. Dr. Roy evaluated Washington in 1992. He conducted clinical interviews and several psychological tests. Dr. Roy's interviews with Washington revealed that he suffered abuse as a child in the form of daily whippings with straps and belts and that adults in the home used alcohol to sedate him as a child. Dr. Roy's review of Washington's school and Department of Corrections ("DOC") records revealed that Washington was placed in classes for the "educable mentally retarded" when he was five years old and that he had been marked as low-IQ while incarcerated. However, Dr. Roy testified that these records conflicted with his own clinical findings because Washington tested at a low-to-average IQ of 96.

Dr. Roy's interviews with Washington also disclosed that Washington had substance abuse problems relating to cocaine and alcohol use. Washington told Dr. Roy that he began drinking recreationally at age eight and was a functional alcoholic by age fourteen. He also told Dr. Roy that he was heavily intoxicated on the night of the murder. Washington also said that he was a heavy cocaine user and that he used about $175 in cocaine per day at the time of the crime.

Finally, Dr. Roy testified that he believed that Washington suffered from diffuse brain damage resulting from early and prolonged drug and alcohol use and numerous traumatic head injuries. Dr. Roy testified that diffuse brain damage can result in disinhibition and poor social judgment as well as poor impulse control and an inability to appreciate the long-term consequences of one's actions. Dr. Roy testified that, in his opinion, Washington's cocaine addiction and his impaired impulse control likely contributed to his ability to be manipulated by others into making poor decisions.

The state called Dr. Eva McCullars, a psychiatrist who also evaluated Washington. Dr. McCullars reviewed Dr. Roy's report and conducted clinical interviews with Washington in June 1993. Dr. McCullars testified that she did not review Washington's DOC records, school records, or adult incarceration records. Dr. McCullars agreed that Washington suffered from diffuse brain damage, but concluded that Washington also suffered from antisocial personality disorder. On direct examination, the state asked Dr. McCullars whether diffuse brain damage could cause hyperkinesis (hyperactive behavior or attention deficit disorder). Dr. McCullars explained that "[hyperkinesis] is one example of diffuse brain damage." She went on to

explain that several prominent individuals including Walt Disney and Thomas Edison exhibited hyperkinetic behavior as children. When questioned on cross examination, Dr. McCullars acknowledged that Washington came from a "significantly dysfunctional family." She also admitted that several of the markers for antisocial personality disorder, such as early truancy and an inability to maintain employment, were more frequently associated with lower socio-economic status Black adolescents, such as Washington, when compared to the general population.

Clarke, Washington's trial counsel, also testified at the PCR hearing. He testified that he did not request Washington's education or corrections records because he believed his interviews with Washington, Skinner, Mondy, and Washington's common law wife, Barbara Bryant, were sufficient. Clarke testified that he had "very extensive discussions" with Washington about what his life was like and any possible substance abuse issues. Clarke also testified that he had "relatively extensive" discussions with Washington's mother, half-brother, and girlfriend. Clarke testified that, based on these interviews, "there wasn't anything that clued me in that there was a special problem that would suggest I should obtain those types of records." With respect to Washington's drug use, Clarke testified that Washington never told him that he was addicted to cocaine or that he was using cocaine on the night of the murder. When questioned on the matter, Clarke acknowledged that Bryant had told him that Washington had a "cocaine problem," but that he did not investigate further.

In a written order, Judge Bradshaw held that Washington was not entitled to relief for ineffective assistance of counsel at the penalty phase. Judge Bradshaw credited Dr. McCullars's findings that Washington had antisocial

personality disorder and was poorly adjusted to living in society. However, Judge Bradshaw concluded that "there is nothing . . . which lessened his ability to differentiate right from wrong or conform his actions with the law." Judge Bradshaw also explained that he had been aware at the time of sentencing that Washington had been doing well while incarcerated. Judge Bradshaw further reasoned that any drug and alcohol dependency "taken separately or with any other mitigating circumstance or circumstances would [not] have mitigated against the sentence [Washington] has received."

On April 25, 1995, the Arizona Supreme Court summarily denied Washington's petition for review of the PCR court's decision.

C.

Washington then commenced his habeas action in the federal district court, culminating in this appeal. In his amended federal habeas corpus petition, Washington raised seventeen claims. The district court determined that certain claims were procedurally barred, and on April 22, 2005, the district court rejected the remaining claims on their merits and dismissed the petition. Washington filed a motion to alter the judgment on May 5, 2005, which the district court denied on June 8, 2005.

On July 11, 2005, Washington filed an untimely notice of appeal from the district court's denial of habeas relief. A three-judge panel of this court held that it lacked jurisdiction and affirmed the district court's denial of Rule 60(b) relief. *Washington v. Ryan*, 789 F.3d 1041 (9th Cir. 2015). We then granted Washington's motion for en banc rehearing. *Washington v. Ryan*, 811 F.3d 299 (9th Cir. 2015). In a 6–5 decision, we held that Washington was entitled to relief

under Rule 60(b)(1) and (6) from his untimely notice of appeal and ordered the district court to "vacate and reenter its judgment denying Washington's petition for writ of habeas corpus, *nunc pro tunc*, June 9, 2005," to render the notice of appeal timely. *Washington v. Ryan*, 833 F.3d 1087, 1102 (9th Cir. 2016). The U.S. Supreme Court denied the state's petition for writ of certiorari. *Ryan v. Washington*, 137 S. Ct. 1581 (2017) (mem.).

Meanwhile, in 2005, the district court issued a 48-page memorandum and order denying Washington's habeas petition. In his PCR proceedings, Washington had "alleged that Clarke rendered ineffective assistance of counsel by failing to interview him regarding potential mitigation and by failing to present evidence of good behavior during incarceration, his unstable family background, and the absence of a violent history or propensity."

In rejecting Washington's claims of ineffective assistance of counsel, the district court held that Washington had to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." It further noted that Washington had to "overcome the presumption that under the circumstances, the challenged action might be considered sound trial strategy," and that it must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

The district court recognized that counsel had a duty to conduct a reasonable investigation and that a failure to adequately investigate and present mitigating evidence can constitute deficient performance. However, the district court concluded that while Clarke could have conducted additional investigation of Washington's background for potential mitigation, it could not conclude "that Clarke

performed deficiently by failing to do so." The court noted that Clarke was an experienced attorney who had worked both as a prosecutor and as defense counsel, had tried thirty to fifty jury trials, and had tried three or four capital cases before he was appointed to represent Washington. The district court stated that Clarke had "began investigating possible mitigation as he investigated the facts of the case," had very extensive discussions with Washington "regarding what his life was like from when he was a young man to the present," and had rather extensive discussions with Washington's common-law wife (Bryant), brother, and mother. The court observed that Clarke testified that he had questioned Washington very closely about his drug use and alcohol intake and about possible physical abuse during his childhood.

Clarke acknowledged that he did not seek Washington's school records because he relied on family members to provide information regarding Washington's education. Clarke did not seek Washington's incarceration records because they were "unlikely to have records relevant to potential mitigation, such as psychological records, because Petitioner had only been incarcerated for two years for burglary and was not 'a hardened criminal.'" Clarke also explained that he did not seek a mental health evaluation of Washington because "he had not observed anything from his many lengthy meetings with Petitioner, or interviews of Petitioner's family, that suggested that such an evaluation was warranted." Clarke also testified that he had questioned family members about any "medical problems" or "anything out of the ordinary" in Washington's background, but had not requested his medical history. Finally, Clarke acknowledged that Bryant had told him that Washington had a "cocaine problem," but noted that Washington had never told Clarke that Washington was addicted to cocaine or had

used cocaine the day of the crime; he had only stated that he had been intoxicated.

The district court noted that Washington "presented no evidence at the state PCR evidentiary hearing to contradict Clarke's testimony." Although Washington in his affidavit averred that Clarke did not discuss the penalty phase with him until twenty minutes before the hearing, the district court determined that "Clarke's presentation of three witnesses at sentencing, each of whom had traveled to Yuma from at least as far away as Banning[,] is alone sufficient to discredit the implication that Clarke failed to prepare for the sentencing until minutes before the aggravation/mitigation hearing." The district court further found at his PCR hearing in state court, Washington had not presented any evidence from Bryant or family members that contradicted Clarke's testimony and that the PCR court "clearly found Clarke more credible than Petitioner's affidavit on these points." Furthermore, Washington presented no evidence that his school records or his incarceration records would have revealed potential mitigation. Rather, the single reference in Washington's school records that he was "educable mentally retarded" was contradicted by Dr. Roy's own testing of Washington, which showed that he had average or low-average intelligence and "was not retarded."

The district court determined that Washington had not shown that Clarke acted unreasonably in not seeking a mental health evaluation. The court observed that there was "scant evidence" that Washington had been treated for any prior mental illness or had any mental health history, and that there was no evidence that Washington, his family members, or friends ever disclosed any concerning incidents to Clarke or suggested that such incidents would have led to relevant

mitigation.[3]    The district court noted that there was no evidence that anyone had told Clarke that Washington had suffered several head injuries during his childhood and adolescence.

The district court further credited Clarke's statements that Washington only told him that he was intoxicated the night of the crime and never said that he had also used cocaine and was an alcoholic and a drug addict.  The court concluded that Clarke had little reason to further investigate Washington's substance abuse and that Clarke had not "conducted an unreasonable investigation."  The district court concluded that "Clarke's investigation and presentation of mitigation was reasonable and that he did not perform deficiently."

The district court further found that even if Clarke had performed deficiently, Washington had not shown that he was prejudiced.  Again citing *Strickland*, the court noted that "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," that the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and that a reasonable probability is a probability sufficient to

---

[3] In his affidavit Washington reported that after he got into trouble when he was fifteen, he received psychiatric counseling as part of his rehabilitation.  He told Dr. Roy that the psychologist concluded that the death of Washington's father had left him without a male figure in his life and this was responsible for the difficulties he experienced. Washington also told Dr. Roy that in 1981 he was taken to the Sacramento County Hospital after overdosing on LSD and passing out, and was admitted to the psychiatric unit, but Dr. Roy noted that there was no evidence regarding the length of his stay, treatment, or diagnosis.

undermine confidence in the outcome. The court noted that it is "asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial."[4]

The district court noted that the state PCR court (Judge Bradshaw), "before whom Petitioner was tried, heard all of the additional mitigation evidence proffered by Petitioner, . . . credited Dr. McCullars's finding of antisocial personality disorder and concluded that Petitioner had not demonstrated a reasonable probability that his sentence would have been different if that mitigation had been presented at trial."

Addressing Washington's intoxication on the night of the crime, the district court noted that under Arizona law, intoxication at the time of a crime can constitute a statutory mitigation if the defendant establishes that his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. The burden is on the defendant to establish this mitigation. *See State v. Woratzeck*, 657 P.2d 870, 870–71 (Ariz. 1982) (holding "appellant had failed to

---

[4] The district court noted that "[a]t the time [Washington] was sentenced, Arizona's death penalty statute required a judge to impose a death sentence if one or more aggravating circumstance were proven beyond a reasonable doubt and the mitigation established by a preponderance of the evidence was not sufficiently substantial to call for leniency." In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Supreme Court ruled that a sentencing judge, sitting without a jury, may not find an aggravating factor necessary for imposition of the death penalty. However, in *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), the Supreme Court held that *Ring* does not apply retroactively to cases such as Washington's that were already final on direct review at the time *Ring* was decided.

show as a mitigating circumstance that intoxication caused significant impairment of his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law"). The district court noted that under Arizona case law, "self-reports of voluntary intoxication at the time a crime was committed are subject to searching skepticism because of the obvious motive to fabricate," "a defendant's claim of alcohol or drug impairment may be rebutted by evidence that he took steps to avoid detection shortly after the murder or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior," and "a long history of drug dependence, absent evidence that a defendant was actually impaired at the time of the crime, does not constitute mitigation."

The district court concluded that the newly proffered evidence of impairment would be accorded little weight. It noted that the only evidence, other than self-reporting, "was Bryant's testimony that Petitioner sounded intoxicated when he called her at least two hours *after* the offense." The court noted that although Washington told the experts that he was intoxicated the night of the crime, neither expert opined as to Washington's capacity to appreciate the wrongfulness of his conduct. Moreover, "evidence supports that Petitioner fled from the Hills' home immediately after they were shot, that he called Bryant, and ultimately purchased a bus ticket to return to Banning."

Addressing the proffered evidence of mental impairment, the district court noted that under Arizona law, "major mental impairments, such as mental illness or brain damage, carry far more mitigating weight than does a personality disorder *if* such impairments demonstrate a defendant's inability to control his conduct or to appreciate the differences between right and wrong." *See* Ariz. Rev.

Stat. § 13-703(G)(1) (2008).  The court noted that although Dr. Roy concluded that Washington had diffuse brain damage, he did not find that such damage significantly impaired Washington's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law.  Dr. McCullars found no indication that diffuse brain damage impaired Washington's capacity.  The district court concluded that the proffered evidence of mental impairment was entitled to minimal weight.

Addressing evidence of a dysfunctional family background, the district court noted that under Arizona law "while a difficult family background, including childhood abuse, may be relevant mitigation at the penalty phase, dysfunctional family history is entitled to significant mitigating weight only if it had a causal connection to the offense-related conduct."  Moreover, the weight accorded a difficult family background may be discounted for an adult offender.  The district court concluded that the additional evidence of Washington's family background was entitled to little weight because neither expert identified any causal connection to Washington's participation in the murder and Washington was 27 years old at the time of the crime.

The district court concluded that there was no reasonable probability that the additional mitigation proffered by Washington would have altered his sentence.  The court noted that even if Washington "was not the actual shooter," there was evidence that he "went into the Hills' home seeking drugs and money and that he knew before entering the home that one or more of its occupants might be shot, 'if things [got] rough,'" and that he "participated in forcing entry into the home, tying up the elderly occupants (face down on the floor) and ransacking their bedroom for valuables."  The district court concluded that Washington's

proffered evidence of voluntary intoxication at the time of the crime, a chronic substance abuse problem, diffuse brain damage, an antisocial personality disorder, and a dysfunctional family background, did not, separately or combined, impair "his capacity to control his conduct to the law's requirements or know the difference between right and wrong." Moreover, Washington had failed to show any causal connection between these factors and the crime that might help explain and thus mitigate his role in the murder. Accordingly, the district court found that Washington had not demonstrated that he was prejudiced by counsel's alleged deficient performance.

## II

We review de novo a district court's decision to grant or deny a habeas petition under 28 U.S.C. § 2254. *See Bean v. Calderon*, 163 F.3d 1073, 1077 (9th Cir. 1998). Because Washington filed his habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the provisions of AEDPA do not apply to this case. *Id*. (citing *Jeffries v. Wood*, 114 F.3d 1484, 1495–96 (9th Cir. 1997) (en banc)). Instead, we review the claim under the familiar standard set out in *Strickland* and its progeny without the added deference required under AEDPA.[5]

---

[5] Although we held this appeal for the Supreme Court's opinion in *Shinn*, 141 S. Ct. 517, its treatment of AEDPA is not applicable to this appeal. However, the Supreme Court reaffirmed that *Strickland* provides the framework for assessing claims of ineffective assistance of counsel. *Id*. at 522.

### III

Although the principles underlying and governing a claim of ineffective assistance of counsel are familiar, they bear repeating. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). Under *Strickland*'s two-part test for claims of ineffective assistance of counsel, a convicted defendant must show (1) constitutionally deficient performance by counsel (2) that prejudiced the defense. *Id*. at 687.

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374. "As is obvious, *Strickland*'s standard, although by no means insurmountable, is highly demanding." *Id.* at 382; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task."). "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ . . . ." *Kimmelman*, 477 U.S. at 382.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Strickland*, 466 U.S. at 690). Even if inadvertence (not tactical reasoning) results in non-pursuit of a particular issue, "relief is not automatic. The Sixth Amendment guarantees

reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id.*

To prevail on his claim for ineffective assistance of counsel, Washington must establish that Clarke's performance was deficient and that Washington suffered prejudice as a result. *See Strickland*, 466 U.S. at 687. To establish deficient performance, Washington must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. To establish prejudice, Washington must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In articulating the standard against which counsel's performance should be judged, *Strickland* emphasized the deference due to a lawyer's decisions both as to scope of investigation and decisions made after investigation: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690. We have likewise recognized the wide latitude to be given to counsel's tactical choices. *See, e.g.*, *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986) ("Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation."). Yet our deference to counsel's performance is not unlimited. As the Court explained in *Strickland*, counsel's strategic choices made after less than complete investigation are reasonable only to the extent that "reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.

**IV**

Washington has not met his burden under the first *Strickland* prong of showing that Clarke provided constitutionally deficient performance by failing to obtain and review Washington's education and incarceration records, failing to investigate possible child abuse and substance abuse, and not seeking a psychological explanation for Washington's conduct.

We recognize that "certain forms of investigation" such as "readily available . . . school, employment, and medical records" "are fundamental to preparing for virtually every capital sentencing proceeding." *Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010). However, we are required to engage in a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible" reasons counsel may have had for proceeding as they did. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (cleaned up); *McGill v. Shinn*, 16 F.4th 666, 689 (noting that we begin our analysis with a "strong presumption" that counsel's decisions reflect "reasonable professional judgment") (quoting *Cullen*, 563 U.S. at 190)); *Gallegos v. Ryan*, 820 F.3d 1013, 1025 (9th Cir. 2016) (holding that "[w]e are 'highly deferential' in reviewing counsel's performance and must be careful not to 'conclude that a particular act or omission of counsel was unreasonable' simply because the defense was ultimately unsuccessful") (quoting *Strickland*, 466 U.S. at 689). Accordingly, in reviewing specific claims of ineffective assistance of counsel based on counsel's alleged failure to

investigate, we must consider what information was "readily available," *Robinson*, 595 F.3d at 1109, to trial counsel at the time and whether there is any evidence that undermines counsel's decisions at that time not to conduct further investigations.

## A.

Clarke did not ignore Washington's education and correction records. Rather he believed that his interviews with Washington, Bryant, and others were sufficient. Clarke presented testimonial evidence of Washington struggling in school and dropping out in the tenth or eleventh grade. Moreover, there is no showing that the education records themselves contain meaningful mitigation evidence. The single proffered item of mitigation in Washington's education records is a 1965 comment (from when Washington was five years old) that he should be placed in special classes for the "educable mentally retarded." But that single, decades-old notation is inconsequential when compared with more than ten additional years of schooling in the general population. Also, any suggestion that the school records showed a meaningfully low IQ is contradicted by later IQ testing by Washington's own expert, Dr. Roy. Indeed, Washington has never even suggested the possibility of intellectual disability. Thus, the sufficiency of Clarke's investigation of Washington's educational records is affirmed by the district court's observation that Washington "presented no evidence that his school records . . . would have revealed potential mitigation."

Similarly, Clarke reasonably thought that Washington's incarceration records were unlikely to contain "records relevant to potential mitigation" because he "had only been incarcerated for two years for burglary and was not a 'hardened criminal.'" Washington has not countered that

assertion by showing that his California incarceration records contained any meaningful mitigating materials. Furthermore, Judge Bradshaw stated that he was aware at the time of sentencing of Washington's good behavior during his incarceration.

## B.

Washington has also not met his burden of showing that Clarke erred by not investigating and presenting evidence of his childhood abuse. In his conversations with Dr. Roy, Washington revealed that he suffered physical abuse as a child in the form of daily whippings and beatings. Roy was also told that Washington was given alcohol as a child to control his behavior. Both psychological experts who testified at the PCR hearing agreed that Washington's childhood was significantly dysfunctional. However, none of this information had come to Clarke's attention before or during the trial. Clarke, at least initially, had to rely on representations by Washington and his family members in determining the extent to which Washington suffered childhood abuse. At the time of his trial, neither Washington nor his family members had indicated to Clarke that Washington had suffered extreme abuse growing up. Accordingly, Clarke did not err by not further investigating Washington's childhood abuse, to the extent that he could have, or by not presenting at the sentencing hearing information he did not have regarding abuse. *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

C.

Similarly, Washington's allegation that Clarke erred by not investigating and presenting evidence of Washington's substance abuse fails because Clarke was not timely informed of Washington's substance abuse. Clarke reasonably relied on his conversations with Washington and his friends and family, which did not indicate any substance abuse. Washington had told Clarke that he was heavily intoxicated on the night of the crimes, but he did not mention any ongoing problems with drugs or with alcohol. Similarly, Washington's mother described him as someone who "liked to party," but also did not say that Washington had problems with addiction. Perhaps the single clue Clarke had that might have raised his suspicions about substance abuse was the statement of Washington's common-law wife that Washington had a "cocaine problem." However, when set against Washington's own statements and those of his family members, Clarke's decision not to further investigate Washington's drug addiction was not objectively unreasonable.

D.

Finally, Washington has not shown that Clarke erred by not seeking a psychological evaluation. Clarke's investigation included extensive discussions with Washington and Washington's family and friends. Clarke asked Washington and his family members about whether Washington "had any propensity to violence," "about his drug use," "about his alcohol intake," "about whether or not he was abused, growing up," about "what discipline was like," and "things of that nature." At the PCR hearing, Clarke testified that, in all the interviews with Washington and his family, nothing triggered any red flags signaling that further investigation of his mental condition would have

been fruitful. There does not appear to have been anything in Washington's education and incarceration records which contradicts this conclusion. Washington's later assertions of diffuse brain damage, a dysfunctional family background, and alcohol and cocaine addiction, if supported by evidence, might lead competent counsel to seek a psychological evaluation, but Clarke, for the most part, knew neither of the assertions nor of evidence supporting the assertions. At the PCR hearing, the experts disagreed as to whether diffuse brain damage was disabling[6] and the proffered evidence of head injuries was less than compelling. Dr. McCullars found that Washington's historical reporting varied from one interviewer to another. Indeed, the record of the PCR proceedings does not contain any medical records substantiating Washington's claims of head injuries. Also, Clarke had extensive discussions with Washington and his family and friends about whether he had been abused growing up, and reasonably determined that Washington's family members would make better witnesses than a psychologist who might examine Washington for a relatively brief period (and might not offer any mitigating conclusions). In addition, Washington's claims of addiction, for the most part, were self-reported well after his trial and do not square with his prior statements to Clarke only that he had been drinking on the day of the crime.

Under the deferential standard required by *Strickland* and its progeny, Clarke's investigation was more than adequate, and his performance was reasonable.

---

[6] Dr. McCullars stated that diffuse brain damage was present in approximately ten to fifteen percent of the population and did not necessarily impair an individual's functioning.

**V**

**A.**

But even if Clarke's performance had been deficient, under *Strickland*, Washington would not be entitled to relief unless he could also show that the deficiency was prejudicial. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *Strickland* "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. To prove prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (citations omitted) (quoting *Strickland*, 466 U.S. at 687). Although the reasonable probability standard "does not require a showing that counsel's actions 'more likely than not altered the outcome,' . . . the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id*. at 111–12 (quoting *Strickland*, 466 U.S. at 693, 697); *see id*. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

To determine whether Washington has met his burden of showing prejudice, we must "reweigh the evidence in

aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). This comparison cannot be made without first clearly identifying the evidence in mitigation that would have been offered at the penalty phase of trial but for counsel's grossly incompetent performance. As noted in our prior retracted opinion, perhaps Washington's best argument is that Clarke was incompetent in failing to present "evidence concerning Washington's potentially impaired cognitive functions." This refers to Dr. Roy's assertions that Washington had symptoms of diffuse brain damage, likely caused by multiple head injuries incurred when Washington was young, and that diffuse brain damage contributes to a "lack of judgment" and an "inability to establish stability in life."

In reweighing this evidence, we must take as our baseline the evidence of aggravation and mitigation offered at trial and the resulting sentence. After considering the details of the brutal, execution-style murder and attempted murder, and weighing it against the mitigation evidence Washington's counsel presented, Judge Bradshaw sentenced Washington to death. With that starting point in mind, we undertake the theoretical inquiry of determining whether it is reasonably likely that Washington would have received a different sentence if the new mitigation evidence were to be added to the mix of mitigation evidence that was presented at trial.

Of course, no guesswork is needed here. We know that Washington's new evidence would not have made a difference because the sentencing judge said so. *See Cook v. Ryan*, 688 F.3d 598, 612 (9th Cir. 2012) (finding no prejudice where "the same trial judge who sentenced" the petitioner to death stated that the new evidence "would not have made any difference"). Judge Bradshaw "considered

*all* of [the new] information in the post-conviction hearing and" definitively "held that none of it would have altered his judgment as to the proper penalty for" Washington. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997).

### B.

A fair evaluation of the evidence in light of Supreme Court precedent confirms the soundness of Judge Bradshaw's finding of no prejudice. Because of *Strickland*'s "highly demanding" standard, *Kimmelman,* 477 U.S. at 382, it is no surprise that petitioners have historically found little success bringing ineffective assistance of counsel claims. However, beginning in 2000, the Supreme Court found *Strickland*'s "high bar" satisfied in four cases involving claims of ineffective assistance of counsel at the penalty phase of a capital trial: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510; *Rompilla v. Beard*, 545 U.S. 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009). These decisions serve as guideposts for determining when relief is warranted in such cases.

In *Williams*, the jury fixed the punishment at death after hearing evidence of a long history of criminal conduct including armed robbery, burglary and grand larceny, auto thefts, violent assaults on elderly victims, and arson. 529 U.S. at 368–70. At sentencing, defense counsel offered very little evidence. *Id*. at 369. In addressing Williams' *Strickland* claim, the Supreme Court cited "graphic" details "of Williams' childhood, filled with abuse and privation," evidence that Williams was "borderline mentally retarded," and other significant mitigation evidence that was not unearthed only because of counsel's deficient performance:

> [C]ounsel did not begin to prepare for that
> phase of the proceeding until a week before

the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* at 395, 398 (citation and footnote omitted). In concluding that Williams had shown prejudice, the Court noted that the same judge who presided over the criminal trial heard Williams' post-conviction review claims. *Id*. at 396. That trial judge, who initially "determined that the death penalty was 'just' and 'appropriate,' concluded that there existed 'a reasonable probability that the result of the sentencing phase would have been different'" if evidence developed in the post-conviction proceedings had been offered at sentencing. *Id.* 396–97.

In *Wiggins*, trial counsel focused their strategy at sentencing on arguing that the defendant was not directly responsible for the murder, and they did not present any other mitigation evidence, despite knowledge of at least some of the defendant's troubled background. 539 U.S.

at 515–16. The Court cited "powerful" mitigation evidence that counsel either had, or should have, discovered. *Id.* at 534–35. When Wiggins was a young child, his alcoholic mother frequently left him and his siblings home alone for days without food, "forcing them to beg for food and to eat paint chips and garbage." *Id.* at 516–17. The mother beat Wiggins and his siblings and had sex with men while her children slept in the same bed. *Id.* at 517. On one occasion, the mother forced Wiggins' hand against a hot stove burner, resulting in his hospitalization. *Id.* After being removed from his mother's custody and placed in foster care, Wiggins was physically abused and "repeatedly molested and raped" by one foster father, and gang-raped on multiple occasions by a foster mother's sons. *Id.* He ran away from one foster home and began living on the streets. *Id.* The Court held that had the jury been presented with Wiggins' "excruciating life history," rather than virtually no mitigation evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537.

In *Rompilla*, trial counsel undertook a number of efforts to investigate possible mitigating evidence, "including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase," but none of these sources was helpful. 545 U.S. at 381. Notwithstanding these efforts, the Court found one "clear and dispositive" error by counsel. *Id.* at 383. Defense counsel knew the prosecution intended to seek the death penalty and would hinge its penalty case on Rompilla's prior conviction for rape and assault. *Id.* Counsel nevertheless failed to even look at the court file for the prior conviction; had they done so "they would have found a range of mitigation leads that no other source had opened up." *Id.* at 384, 390. The mitigation

evidence that would have been available from simply looking at the files included, among other things:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id*. at 391–92. All the evidence counsel failed to discover simply by failing to look at the court file of the prior conviction "add[ed] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Id*. at 393. The Court thus concluded there was a

reasonable probability of a different result had counsel performed adequately. *Id*.

In *Porter*, penalty phase counsel offered scant evidence on behalf of Porter. "The sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Porter*, 558 U.S. at 32. Post-conviction review proceedings revealed several facts about Porter's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." *Id*. at 33.

> Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child. Porter's father was violent every weekend, and by his siblings' account, Porter was his father's favorite target, particularly when Porter tried to protect his mother. On one occasion, Porter's father shot at him for coming home late, but missed and just beat Porter instead.

*Id*. Porter's company commander in the Army also offered a "moving" account of Porter's heroic efforts "in two of the most critical—and horrific—battles of the Korean War," for which Porter "received two Purple Hearts and the Combat Infantryman Badge, along with other decorations." *Id*. at 30, 34–35, 41. A neuropsychologist "concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior." *Id*. at 36. The expert also testified that "[a]t the time of the crime . . . Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional

disturbance," which would have provided a basis for two statutory mitigating circumstances. *Id*.

In concluding Porter established prejudice, the Court reasoned that "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability. They learned about Porter's turbulent relationship with [the victim], his crimes, and almost nothing else." *Id*. at 41. The Court emphasized the significance of Porter's military service, both because "he served honorably under extreme hardship and gruesome conditions" and because "the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter." *Id.* at 43–44 (footnote omitted).

A comparison of the failures by counsel in *Williams*, *Wiggins*, *Rompilla*, and *Porter*, with Washington's situation confirms the adequacy of counsel's representation of Washington and that Washington was not prejudiced by any alleged shortcoming on Clarke's part. First, *Porter* is distinguishable because of the Court's emphasis on the unique significance of military service in potentially mitigating against aggravating factors. *See Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did."). Likewise, *Rompilla* is distinguishable because there is no analog here to the "dispositive" failure of trial counsel in *Rompilla* to look at the records that prosecution had indicated would serve as the basis for its case for the death penalty.

Second, although the evidence of Washington's head injuries suggests a difficult childhood and perhaps might provide a more complete picture of his background than was

presented at trial, that evidence is not nearly as substantial or extreme as the mitigating evidence in the four Supreme Court decisions. The possible head injuries and the suggested harsh discipline of Washington's mother are not comparable to the outright beatings and criminal neglect of Williams' parents, the starvation, neglect, physical abuse, molestation and rape, and gang-rape Wiggins suffered at the hands of his mother and foster families, Rompilla being locked up with his brother "in a small wire mesh dog pen that was filthy and excrement filled," deprived of clothing, and beaten by his alcoholic father, or the other harrowing facts in those cases. *See Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011) ("Even the more complete picture portrayed in the proffer of Rhoades's dysfunctional family with its alcoholism, abuse, aberrant sexual behavior, and criminal conduct does not depict a life history of Rhoades himself that is nightmarish as it was for the petitioners in cases such as *Rompilla*, *Wiggins*, and *Williams* . . . .").

Thus, even if Judge Bradshaw's finding of no prejudice were not dispositive, we would nonetheless find that Washington has not met his burden of showing that his counsel's failure to present additional evidence at sentencing was prejudicial.

## VI

We are not insensitive to the fact that Washington is the only one of the three perpetrators who continues to face the death penalty. All three were initially sentenced to death. On appeal, the Arizona Supreme Court affirmed Washington and Robinson's convictions and sentences, *State v. Robinson*, 796 P.2d 853 (Ariz. 1990), but found insufficient evidence to convict James Mathers and vacated his conviction, *State v. Mathers*, 796 P.2d 866 (Ariz. 1990). Even though the record suggests that Mathers was the

shooter, and Judge Bradshaw thought that the evidence against Washington was no greater than the evidence against Mathers, Judge Bradshaw nonetheless denied Washington's PCR petition.

In 2010, in a split decision, we granted a writ of habeas corpus vacating the sentence of Washington's co-defendant Fred Robinson in large part because he received ineffective assistance of counsel. *Robinson*, 595 F.3d at 1086.[7]  As noted, Washington and Robinson were tried and sentenced together, and their convictions and sentences were affirmed in state court following joint PCR proceedings, in nearly identical written orders.  Like Washington, Robinson alleged that he received ineffective assistance of counsel based on his trial counsel's failure to present mitigation evidence at the penalty phase.  *Id*. at 1108–10.  As he did with Washington, Judge Bradshaw concluded that the mitigation evidence Robinson produced in the state PCR proceeding would not have made a difference.

---

[7] Judge Rawlinson dissented.  She concluded:

> The state post-conviction court fully considered the mitigation evidence presented by Robinson.  Its subsequent emphatic ruling that the mitigation evidence would not have affected the sentence imposed compels a conclusion of no prejudice under the rationale of *Van Hook* and *Wong*.  For that reason and because Robinson's challenge to the cruelty prong of the statutory aggravating factors is procedurally barred, I respectfully dissent.

595 F.3d at 1118–19.  Robinson was resentenced to 67 years to life.  Robinson has since passed away.  Ariz. Dep't of Corrections, *Inmate Death Notification – Robinson* (Mar. 7, 2016), https://corrections.az.gov/article/inmate-death-notification-robinson.

However, the sharing of a procedural history does not make two cases analogous. Rather, the critical questions—whether counsel's performance was constitutionally deficient and whether any deficiency resulted in prejudice—must be individually considered and separately considered in each case. *See, e.g.*, *Strickland*, 466 U.S. at 705 (Brennan, J. concurring in part and dissenting in part) ("In the sentencing phase of a capital case, '[w]hat is essential is that the jury have before it all possible relevant information about the individual whose fate it must determine.'") (alteration in original) (citing *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (opinion of Stewart, Powell, and Stevens, J.J.). Indeed, Judge Bradshaw commented: "[h]owever one may view the reversal of Mathers' conviction, it does not follow, either legally or logically, that this petitioner is entitled to the same treatment as his co-defendant, James Mathers. It most certainly does not mandate a change in his sentence." He instructed the jury in Washington's case at the trial court to "consider the charge against each defendant separately." Thus, even though the record suggests that Robinson was the mastermind of the crime, in reviewing the Washington's state conviction and sentence we are limited to considering the facts and legal arguments particular to his case.

On the issues of attorney competence and prejudice, the facts of *Robinson* differ starkly from the facts here. Robinson's trial counsel "engaged in virtually no investigation" and "did not call a single witness or introduce any evidence" at the sentencing hearing. *Robinson*, 595 F.3d at 1109. In contrast, here, Clarke investigated potential mitigation evidence by having "very extensive" discussions with Washington about his background and by interviewing—both before trial and after the verdict—Washington's mother, brother, and common-law wife. Clarke also called three witnesses, each of whom offered

testimony supporting a cogent narrative that Washington was friendly yet gullible, non-violent, and a loving father (and son) and that he desired to make something of his life.

In *Robinson*, the utter failure of Robinson's counsel was critical. We based our finding of prejudice on counsel's non-performance because, under Arizona's death penalty statute at the time of sentencing, the "failure to present a mitigation defense all but assured the imposition of a death sentence." *Robinson*, 595 F.3d at 1111 (quoting *Summerlin v. Schriro*, 427 F.3d 623, 640 (9th Cir. 2005)). We also distinguished two Supreme Court cases—*Bobby v. Van Hook*, 558 U.S. 4 (2009) and *Wong v. Belmontes*, 558 U.S. 15 (2009)—on the basis that Robinson's counsel failed to put on any mitigation evidence. *Robinson*, 595 F.3d at 1111 n.21 (stating that in both *Van Hook* and *Wong* "defense counsel presented a significant amount of mitigating evidence"). Here, Clarke presented substantial mitigating evidence and Washington has not shown that the evidence proffered in his PCR was likely to make a difference.

## VII

Washington also argues that counsel was ineffective because he allowed the state court to require a nexus between his proffered mitigating evidence and the crime. A similar issue was raised in *Robinson*. The state had argued that the new evidence should be disregarded altogether because it lacked a "causal connection" to the crime. *See id*. at 1111–12. We rejected that argument based on Supreme Court precedent holding that evidence of a defendant's background and mental capacity is relevant to mitigation and cannot be ruled inadmissible simply because the defendant fails to show a causal connection between the evidence and the crime. *Id*. at 1112; *see Smith v. Texas*, 543 U.S. 37, 45 (2004) (reaffirming the holdings of *Eddings v. Oklahoma*,

455 U.S. 104 (1982), and *Tennard v. Dretke*, 542 U.S. 274 (2004)).

Washington argues that in his PCR proceeding the state court failed to consider his proffered mitigating evidence because of a lack of causal nexus. We do not agree. There is a critical difference between the admissibility of evidence and the weight given to that evidence. Although a court must allow a defendant to present any mitigation evidence, *see Smith*, 543 U.S. at 44–45, *Eddings*, 455 U.S. at 114, and *Tennard*, 542 U.S. at 284–85, "the failure to establish . . . a causal connection may be considered in assessing the quality and strength of the mitigation evidence," *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006). *See McKinney v. Ryan*, 813 F.3d 798, 817–18 (9th Cir. 2015) (en banc) (referring to *Newell*'s rule as "proper[]").

In discussing Washington's evidence of substance abuse, Judge Bradshaw concluded that the asserted drug and alcohol dependence did not affect Washington's "ability to conform his actions to the demands of society." This could be construed as echoing Arizona's former improper causal nexus test. *See McKinney*, 813 F.3d at 810; Ariz. Rev. Stat. § 13-703(G)(1) (2008). Had Judge Bradshaw said nothing more, it might be inferred that he failed to consider Washington's evidence for purposes of non-statutory mitigation. But Judge Bradshaw didn't stop there; the very next sentence in his order shows that he in fact considered the evidence. He concluded that the evidence of substance abuse, considered alone or together with other mitigation evidence, would not "have mitigated against the sentence [Washington] has received."

The district court recognized that the state court properly considered Washington's mitigating evidence. It commented that the state court "neither [mis]understood

state law to preclude consideration of relevant proffered mitigation, nor to impose a minimum threshold before such mitigation could be considered."   The district court understood Judge Bradshaw to have "considered the mitigation [evidence] proffered to show prejudice, but [Judge Bradshaw] determined that it carried insufficient *weight* to alter the sentence."

Thus, the conclusion that the evidence of substance abuse lacked a causal nexus to the crime was appropriate because "a court is free to assign less weight to mitigating factors that did not influence a defendant's conduct at the time of the crime." *Hedlund v. Ryan*, 854 F.3d 557, 587 n.23 (9th Cir. 2017).  The state court's weighing of Washington's evidence of substance abuse does not support his claims of ineffective assistance of counsel.[8]

## VIII

Washington and his two co-defendants were convicted and sentenced to death for the murder of Sterleen Hill and the attempted murder of Ralph Hill.  Over the past 30 years, one of Washington's co-defendants had his conviction overturned and the other had his sentence vacated (and has died).  Under these circumstances, there may be a temptation to bend the governing legal standards to equalize the outcomes for the three defendants in an effort "to achieve what appears a just result." *Holland v. Florida*, 560 U.S. 631, 673 (2010) (Scalia, J., dissenting).  However enticing the impulse, that is not our role.  Although Judge Bradshaw had the power to temper justice with mercy, in our role as a

---

[8] Washington's able and zealous habeas counsel does not contend Judge Bradshaw committed an *Eddings* error as to the psychological evidence.

federal court on habeas review, we do not. Ours is the duty to determine whether Washington has met his high burden of showing pursuant to *Strickland* that his attorney performed deficiently to his prejudice. The Supreme Court reiterated in *Harrington*, 562 U.S. at 104, that to be entitled to relief, the petitioner "had to show both that his counsel provided deficient assistance and that there was prejudice as a result." A failure to heed this standard would constitute "an improper intervention in state criminal processes," and violate "the now well-settled meaning and function of habeas corpus in the federal system." *Id*. at 104. Accordingly, we may not ignore this exacting standard to "remedy" Judge Bradshaw's choice against leniency.

Rather, applying the familiar standard articulated in *Strickland*, we assess the state court record to determine whether Washington's counsel was constitutionally deficient and whether the deficient performance resulted in prejudice. *See Van Hook*, 558 U.S. at 7 (applying the *Strickland* analysis in a pre-AEDPA case). We conclude that Washington has not met his burden of showing that his counsel performed deficiently or that the alleged deficiency was prejudicial. He has not shown that the omission of the new mitigation evidence deprived him of "a fair trial," *see Strickland*, 466 U.S. at 687, or that the omission undermines our confidence that the trial "produced a just result," *see id*. at 686. Accordingly, the district court's denial of Washington's habeas petition is **AFFIRMED**.

GOULD, Circuit Judge, concurring in part and concurring in the judgment:

I concur in part, joining the opening paragraph (except for the language on page 7 stating that "Washington has not

shown either that his trial counsel's performance was constitutionally deficient or"), Sections I, II, III, V, VI, and VII, but do not join Sections IV and VIII, which I conclude are unnecessary to resolve the *Strickland* ineffective assistance of counsel issue.  I also concur in the judgment.